# UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | |
|---|---|
| DANIEL J. CAMBRA, individually and on behalf of all others similarly situated, | ) ) ) **CIVIL ACTION NO.**: 09-CV-2617 JAR/JPO |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| YRC WORLDWIDE, INC., WILLIAM D. ZOLLARS, MICHAEL BYRNES, CASSANDRA CARR, DENNIS FOSTER, PHILLIP MEEK, YRC WORLDWIDE, INC. BENEFITS ADMINISTRATIVE COMMITTEE, HAROLD D. MARSHALL and DOES 1-10, | ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiff Daniel J. Cambra ("Plaintiff"), a participant in the Yellow Roadway Corporation Retirement Savings Plan (the "Plan") during the proposed Class Period (defined below), alleges as follows on behalf of the Plan,[1] himself and a class of all others similarly situated:

## INTRODUCTION

1.      This is an action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

2.      Plaintiff was a participant in the Plan during the Class Period, during which time the Plan held interests in the common stock of YRC Worldwide, Inc.

---

[1]      The term "Plan" includes predecessor plans including, without limitation, the New Penn Motor Express, Inc. 401(k) Retirement Plan and the YRC Regional Transportation, Inc. 401(k) Plan, both of which were merged into the Plan effective December 31, 2008.

("YRCW" or the "Company").  Plaintiff's retirement investment portfolio in the Plan during the Class Period included YRCW stock.

3.      401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio. Common stock of YRCW was one of the investment alternatives of the Plan throughout the Class Period.

4.      Plaintiff alleges that Defendants, who acted as "fiduciaries" of the Plan as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to him and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plan's substantial holdings of YRCW stock.

5.      Specifically, Plaintiff alleges in Count I that certain Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to him, the Plan and the proposed Class by failing to prudently and loyally manage the Plan's investment in Company securities by (1) continuing to offer YRCW common stock as one of the Plan's investment options when it was imprudent to do so; (2) failing to provide complete and accurate information to participants in the Plan regarding the Company's financial condition and the prudence of investing in Company stock; and (3) maintaining the Plan's pre-existing heavy investment in YRCW equity when Company stock was no longer a prudent investment for the Plan.  These actions and inactions run directly counter to the express purpose of

ERISA pension plans, which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

6.     Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and the participants' best interests in mind.

7.     Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management or administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering YRCW stock as an investment option and investing Plan assets in YRCW stock when it was no longer prudent to do so.

8.     Plaintiff alleges that Defendants allowed the heavy imprudent investment of the Plan's assets in YRCW equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent, among other reasons, because, as explained in detail below: (a) demand for the Company's trucking services was deteriorating; (b) the Company was experiencing debilitating increases in operating costs, while simultaneously having trouble securing adequate credit facilities; (c) the Company saw a substantial increase in its debt-to-equity ratio; (d) numerous analysts downgraded the Company's credit ratings; (e) the Company's declining business prospects presented a high likelihood of YRCW taking drastic action, such as filing for bankruptcy or engaging in a debt-for-equity exchange with its creditors;

and (f) the Company's stock price would inevitably suffer as the Company's business essentially disintegrated.

9.      This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as those alleged herein, Plaintiff brings this case derivatively on behalf of the Plan and as a class action on behalf of all participants and beneficiaries of the Plan during the proposed Class Period.

**A.      JURISDICTION AND VENUE**

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district in which the Plan is administered, where the breaches took place and/or where one or more defendants reside or may be found.

**B.      PARTIES**

**Plaintiff**

12.      Plaintiff Daniel J. Cambra is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held YRCW shares in his retirement investment portfolio during the Class Period.

**Defendants**

> **(a)   The Company**

13.   Defendant YRCW is one of the largest transportation service providers in the world and provides services that include global, national and regional transportation as well as logistics.   As further described below, YRCW was a fiduciary of the Plan because it exercised discretionary authority with respect to management and administration of the Plan and/or any authority with respect to management and disposition of the Plan's assets.   The Company acted through the Board of Directors (the "Board"), the Board's Compensation Committee (the "Compensation Committee"), as well as its Chief Executive Officer ("CEO"), Vice President-Employee Benefits, Benefits Administrative Committee and other Company officers and employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

> **(b)   Director Defendants**

14.   Defendant William D. Zollars ("Zollars") served as Chairman of the Board and CEO during the Class Period.

15.   Defendant Michael Byrnes ("Byrnes") served as a member of the Board during the Class Period.   Defendant Byrnes also served as a member of the Compensation Committee during the Class Period.

16.   Defendant Cassandra Carr ("Carr") served as a member of the Board during the Class Period.   Defendant Carr also served as a member of the Compensation Committee during the Class Period.

17.     Defendant Dennis Foster ("Foster") served as a member of the Board during the Class Period.  Defendant Foster also served as Chair of the Compensation Committee during the Class Period.

18.     Defendant Phillip Meek ("Meek") served as a member of the Board during the Class Period.  Defendant Byrnes also served as a member of the Compensation Committee during the Class Period.

### (c)     Benefits Administrative Committee

19.     Defendant YRC Worldwide Benefits Administrative Committee served as the Plan Administrator during the Class Period.  The Benefits Administrative Committee is comprised of certain Company employees/officers appointed by the Company through the Compensation Committee of the Board.  The Administrative Committee is charged with the day-to-day management and administration of the Plan and/or management and disposition of the Plan's assets.

20.     Defendant Harold D. Marshall ("Marshall") served as Chairman of the Benefits Administrative Committee and as the Company's Vice President-Employee Benefits during the Class Period.

21.     John Does 1-10 are additional Company officers, directors and employees who were fiduciaries of the Plan during the Class Period, including members of the Benefits Administrative Committee, the identities of whom are currently unknown to Plaintiff.  Plaintiff reserves the right, once the identities of such individuals are ascertained, to seek leave to join them to the instant action.

## C.     THE PLAN

22.     The Plan is an employee benefit plan within the meaning of ERISA §§ 3(2)(A) and 3(3), 29 U.S.C. §§ 1002(2)(A) and 1002(3), and an "employee pension

benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

23. The Plan provided for individual accounts for each participant and for benefits based upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

24. Prior to December 31, 2008, the Company and its operating subsidiaries maintained multiple defined contribution plans, including the Plan, as well as the New Penn Motor Express, Inc. 401(k) Retirement Plan and the YRC Regional Transportation, Inc. 401(k) Plan. However, effective December 31, 2008, the Company merged all of its domestic 401(k) savings plans and profit sharing plans into the Plan. *See* 2008 Form 10-K, at 59.

25. Generally, full-time employees of the Company and its participating subsidiaries become eligible to participate in the Plan on the one-month anniversary of their employment. Part-time employees generally become eligible to participate in the Plan on the first anniversary of their employment in which they have been credited with at least 1000 hours of service during the prior year.

26. Contributions to the Plan can be made by both the Company and by participants. A participant may make pre-tax and after-tax contributions subject to Internal Revenue Service (IRS) and Plan limitations.

27.     The Plan provides for automatic enrollment and a pre-tax contribution of 3% of compensation for those employees who are eligible to participate.  Employees may affirmatively elect not to participate in the Plan or elect a higher or lower contribution rate, subject to the IRS and Plan limitations.

28.     The employer may make a nondiscretionary matching contribution equal to 50% of each participant's pre-tax contributions for the plan year, up to 6% of the participant's compensation for the plan year.  Effective January 1, 2009, the Company suspended all employer matching contributions.  *See* 2008 Form 10-K at 59 (also noting that the Company intended to resume such contributions during the second half of 2009).

29.     Prior to October 2008, the Company made half of its non-discretionary match for the Plan in YRCW common stock and the other half in cash.[2]

30.     For each plan year, the Company could also make performance-based contributions in cash, Company common stock, or other property as determined by the Company; all such contributions, however, were required to be invested in Company common stock.

31.     Participants may direct the investment of future contributions made by them and on their behalf in any of a number of discretionary investment funds.  However, performance-based contributions and 50% of the nondiscretionary matching contributions are invested in Company common stock.

32.     Participants are 100% vested in their accounts at all times.

33.     As of December 31, 2006, the Plan had $101,661,552 invested in Company stock.  Since the beginning of the Class Period, the Company's stock price has suffered a 95% decline in value.  Upon information and belief, during the Class Period,

the Plan has suffered at least $60 million in losses as result of its holdings of Company stock.

34.     A portion of the Plan is purportedly an employee stock ownership plan ("ESOP").  However, fiduciaries of an ESOP remain bound by core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

35.     Accordingly, if the fiduciaries know – or if an adequate investigation would reveal – that company stock no longer is a prudent investment for the ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the Plan by investing the Plan's assets in other suitable investments.

## D.     CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, himself and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between October 25, 2007 and the present (the "Class Period") and whose Plan accounts included investments in YRCW common stock.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several thousand members[3] of the Class who participated in, or were beneficiaries of,

---

[2] Effective October 2008, the entire Company match was made in cash.
[3]        According to the 2007 Form 5500, the Plan had over 13,000 participants as of December 31, 2007.

the Plan during the Class Period and whose Plan accounts included investment in YRCW stock.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether Defendants owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

        (b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and Beneficiaries;

        (c)     whether Defendants violated ERISA; and

        (d)     whether the Plan and members of the Class have sustained damages and, if so, the proper measure of damages.

39.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendants' uniform and wrongful conduct in violation of federal law as complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in complex class actions and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

41.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

42.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## E.     DEFENDANTS' FIDUCIARY STATUS

43.     During the Class Period, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary, with discretionary authority with respect to the management of the Plan and/or any authority with respect to the management or disposition of the Plan's assets.

44.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

45.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of

its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

46.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

47.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

48.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

49.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to assign the appointment and removal of fiduciaries, such as the Administrative Committee members, to itself.

50.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

51.     During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

### (a)     The Company's Fiduciary Status

52.     Instead of delegating fiduciary responsibility for the Plan to external service providers, the Company chose to internalize certain vital aspects of this fiduciary function.

53.     The Company acted through the Board, the Compensation Committee, the Benefits Administrative Committee and certain other officers and employees.  The Company had, at all applicable times, effective control over the activities of its officers and employees, including over their Plan-related activities.  The Board had the authority and discretion to hire, appoint, monitor, and remove the members of the Benefits Administrative Committee, as well as other officers and employees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

54.     By failing to properly discharge their fiduciary duties under ERISA, the employee and officer defendants, including the Benefits Administrative Committee Defendants, breached fiduciary duties they owed to the Plan, the participants and their beneficiaries.  Such individuals were appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.  Accordingly, the

actions of such employee fiduciaries are imputed to the Company under the doctrine of *respondeat superior* and the Company is liable for these actions.

(b)      **Director Defendants' Fiduciary Status**

55.      The Board has primary oversight of the Plan.  Indicative of the Board's authority, the Board was responsible for selecting, monitoring and removing members of the Benefits Administrative Committee.  *See* Compensation Committee Charter, available at:  http://www.yrcw.com/corporategovernance/index.html ("Compensation Committee Charter").

56.      One of the primary purposes of the Compensation Committee was to "act on behalf of the Board to…appoint health, welfare and retirement plan administrators, trustees and other similarly required positions and monitor and provide oversight to these plans."  *Id.*

57.      The Compensation Committee responsibilities expressly included a duty to "monitor the investment performance of the assets of the qualified retirement plans and recommend any changes in investment policy."  *Id.*

58.      The Compensation Committee also had a duty to "take actions regarding benefit plans that the Committee determines are necessary or desirable."

59.      The Compensation Committee had a duty to "appoint members of the Benefits Administrative Committee, which will serve as the plan administrator and named fiduciary for all benefit plans."

60.      The Compensation Committee was responsible for monitoring the Benefits Administrative Committee.  According to its charter, "[t]he Committee may delegate its responsibilities and related authority to the Benefits Administrative

Committee with respect to employee benefit plans, **subject to the Committee's oversight**." *Id.* (emphasis added).

61. Ultimately, the Board collectively retained responsibility for the Compensation Committee's actions. Each member of the Compensation Committee served at the pleasure of the Board. *Id.* The Compensation Committee was required to report to the Board on a regular basis. Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plan and their participants in that regard.

(c) **Benefits Administrative Committee's Fiduciary Status**

62. The Benefits Administrative Committee is comprised of persons appointed by the Compensation Committee who are responsible for the day-to-day responsibility for the administration of the Plan. The Benefits Administrative Committee and its members, including Defendant Marshall, were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they were, upon information and belief, named fiduciaries of the Plan and exercised discretionary authority with respect to the management and administration of the Plan and/or authority with respect to management and disposition of the Plan's assets.

(d) **Additional Fiduciary Aspects of Defendants' Actions/Inactions**

63. ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them. A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries. "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section

404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996); *see also In re Unisys Corp. Retiree Medical Benefit ERISA Litig.,* 57 F.3d 1255, 1261 (3d Cir. 1995).

64. Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct inaccurate or misleading information so that plan participants will not be injured. *See*, *e.g.*, *In re Unisys Corp., supra,* 994 F.2d at 133 ("[A] plan administrator has an affirmative duty to speak when it knows that silence might be harmful."); *see also*; *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002); *Matthews v. Chevron Corp.*, 362 F.3d 1172, 1180 (9th Cir. 2004).

65. During the Class Period, upon information and belief, the Company and certain other Defendants made direct and indirect communications with the Plan participants, including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan or participant holdings of Company stock) which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, the Company's SEC filings were incorporated into and made part of the SPDs, prospectuses and/or applicable SEC Form S-8 registration statements. Defendants acted as fiduciaries to the extent of this activity.

66. Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press, concerning investments in company stock, including that:

- Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

- Out of loyalty, employees tend to invest in company stock;

- Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

- Employees tend not to change their investment option allocations in the plan once made;

- No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

- Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

- Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards. [4]

67.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's funds in Company stock, they took no action to protect the Plan's assets from imprudent investment in Company stock.

## F.    SUBSTANTIVE ALLEGATIONS

68.    YRCW describes itself as one of the largest transportation service providers in the world, and the holding company for a portfolio of brands including YRC, YRC Reimer, YRC Glen Moore, YRC Logistics, New Penn, Holland and Reddaway.

---

[4]    *See, e.g.,* Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/ pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/); Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plans - the importance of plans design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

69.     Throughout the Class Period, Defendants knew or should have known that YRCW stock was an imprudent Plan investment, because: (a) demand for the Company's trucking services was deteriorating; (b) the Company was experiencing debilitating increases in operating costs, while simultaneously having trouble securing adequate credit facilities; (c) the Company saw a substantial increase in its debt-to-equity ratio; (d) numerous analysts downgraded the Company's credit ratings; (e) the Company's declining business prospects presented a high likelihood of YRCW taking drastic action, such as filing for bankruptcy or engaging in a debt-for-equity exchange with its creditors; and (f) the Company's stock price would inevitably suffer as the Company's business essentially disintegrated.

70.     Defendants knew or should have known that YRCW stock was an imprudent investment for the Plan.  Their fiduciary duties notwithstanding, Defendants failed to protect the Plan participants' retirement savings from being imprudently invested in YRCW stock and, as a result, the Plan suffered substantial losses.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan lost tens of millions of dollars on account of imprudent investments in Company stock.

**(a)     YRCW's Common Stock was an Imprudent Plan Investment Because the Company was Severely Impacted by a Drop in its Business and Increased Operating Costs**

71.     Beginning in 2007 and throughout 2008, adverse economic conditions and softening demand had been taking a toll on the Company's business.

72.     On October 25, 2007, the first day of the Class Period, Defendant Zollars announced in the Company's third quarter earnings press release that the "weak domestic shipping market" was significantly impacting the Company's operating performance.

18

73.   At the same time, Zollars assured the public that YRCW was taking action to "redress these performance issues."  YRCW also announced that operating income for the quarter was $88 million, as compared to $178 million for the third quarter of 2006.

74.   On this day, YRCW stock closed at $25.96 per share.

75.   On January 2, 2008, the Company announced that it expected to incur non-cash impairment charges for the quarter of between $700 million and $800 million pre-tax.

76.   On this day, YRCW stock closed at $15.43 per share.

77.   The next day, on January 3, 2008, YRCW's Bank Loan Debt Rating and Senior Unsecured Debt Rating was lowered to BB+ from BBB- by Fitch.

78.   On this day, YRCW stock closed at $13.82 per share.

79.   On January 28, 2008, YRCW announced a loss of $11.17 per share for fiscal year 2007.  Defendant Zollars once again referenced the challenging economic environment, and stated that things were not expected to improve in the near term.

80.   On this day, YRCW stock closed at $16.08 per share.

81.   On February 21, 2008, YRCW's credit rating was lowered to BB from BB+ by S&P.

82.   On April 18, 2008, YRCW filed with the SEC a Form 8-K that stated, in relevant part:

> On April 18, 2008, YRC Worldwide Inc. (the "Company") and certain of its foreign subsidiaries entered into Amendment No. 1 (the "Credit Agreement Amendment") to the Credit Agreement, dated as of August 17, 2007 (the "Credit Agreement"), among the Company, the foreign subsidiaries and the lenders and agents party thereto. The Credit Agreement was previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K, filed on

August 22, 2007. The Credit Agreement, as amended (the "Credit Facility"), continues to provide the Company with a $950 million senior revolving credit facility, including sublimits available for borrowings under certain foreign currencies, and a $150 million senior term loan.

The Credit Agreement Amendment:

- increases, until such time as the Company receives a rating of BBB- or better from Standard & Poor's and Ba1 or better from Moody's, in each case with a stable outlook (the "Fall Away Event"), the Company's Total Leverage Ratio (as defined in the Credit Facility) from 3.0x to (i) 3.75x for each of the fiscal quarters ended March 31, June 30 and September 30, 2008 and (ii) 3.5x for each fiscal quarter thereafter; this was a proactive amendment however, as the Company's Total Leverage Ratio for the fiscal quarter ended March 31, 2008 was below 3.0x; and
- increases the interest rates and fees applicable to the revolving credit facility and term loan as set forth in the definition of "Applicable Rate" in Section 1.01 of the Credit Facility; effective with this amendment, the interest rate on amounts outstanding under the revolving credit facility and term loan is LIBOR plus 100 basis points and LIBOR plus 125 basis points, respectively, and the facility fee for the revolving credit facility is 25 basis points; the Company expects interest expense to increase $1.5 – 4.0 million annually with this amendment.

83.     On this day, YRCW stock closed at $14.70 per share.

84.     On April 24, 2008, YRCW announced a first quarter loss of $0.81 per share. Defendant Zollars cited a "soft economy, severe winter weather and record fuel prices" as some of the factors contributing to the loss.

85.     On this day, YRCW stock closed at $12.96 per share.

**(b)     The Company Takes a Turn for the Worse**

86.     In September and October 2008, the price of YRCW stock began to fall. As a result, the Company issued a press release on October 7, 2008 entitled "YRC Worldwide Reaffirms Financial Condition."   In the press release, the Company "reaffirmed" that it expected positive free cash flow in the third and fourth quarters of 2008.  Defendant Zollars stated that "[d]espite the continuing unrest in the broad financial markets, our current financial position is solid and we remain well positioned to weather this economic environment."

87.     On this day, YRCW stock closed at $4.98 per share.

88.     On January 8, 2009, YRCW announced that its employees represented by the International Brotherhood of Teamsters voted to modify their current labor agreements for Yellow Transportation, Roadway, Holland and New Penn.   Most significantly, the new contracts featured a 10 percent reduction in wages in exchange for a 15 percent ownership stake in the Company.   YRCW's corresponding press release stated, in relevant part:

> YRC Worldwide Inc. (Nasdaq: YRCW) announced today that its union employees represented by the International Brotherhood of Teamsters have voted overwhelmingly to modify the current labor agreements for the company's Yellow Transportation, Roadway, Holland and New Penn business units.
>
> The modified contract includes a 10 percent reduction in all wages paid, inclusive of scheduled increases, and the suspension of cost of living adjustments (COLA) for the remaining life of the contract.  In exchange, Teamsters employees will receive a 15 percent ownership stake in YRC Worldwide, allowing them to share in future company performance. Contributions to the health, welfare and pension plans will continue as previously negotiated.

Non-union employees will experience the same or greater percent reduction in total compensation as their union counterparts, including modifications made last year to the non-union pension, retirement and other benefit programs. Non-union employees have also received options to purchase up to a seven percent ownership stake in the company. Senior executives will reduce total compensation, but will not be eligible to participate in the stock option program.

Bill Zollars, Chairman, President and CEO of YRC Worldwide, commented, "During a time of economic hardship, we are proud of the understanding and support of our employees. The amended contract will provide our company with significant annual cost reductions that will also have long-term benefits as the economy recovers."

The company expects to achieve $220 to $250 million in annual savings from its labor contract modification during the remaining term of the contract in addition to the $75 to $85 million in savings in 2009 from the non-union compensation reductions that were effective January 1, 2009. The company also expects to improve 2009 operating income by a run rate of $200 million from the integration of the Yellow Transportation and Roadway networks that is expected to be complete in early spring 2009.

"This agreement is another critical step in our wide-ranging plan to strengthen our balance sheet, while enhancing service for our customers through our national integration of Yellow and Roadway," said Zollars. "With this wage reduction and our other planned cost savings, we are confident that we can sustain our liquidity position and meet our debt obligations, despite the economic downturn, upon completion of negotiations on an amendment to our credit facilities."

89.     On this day, YRCW stock closed at $4.68 per share.

90.     By April 2009, it was clear to the public that the Company was in dire straits, due in part to the economy, the shipping industry, and YRCW's debt and credit problems.   On April 7, 2009, the Company revealed in a Form 8-K that it had experienced "accelerated" declines in shipping volumes in the first quarter.   Moreover,

the Company revealed that it expected to take charges of between $165 million and $185 million in the first quarter.

91.    On this day, YRCW stock closed at $4.07 per share.

92.    On April 13, 2009, *Bloomberg* reported that YRCW was in talks with its union and other groups "to allow YRC to provide some of its real estate as collateral to pension funds in lieu of making payments of contributions for certain to-be-agreed-upon months."

93.    On this day, YRCW stock closed at $4.19 per share.

94.    Things only worsened from this point.  Two weeks later, on April 23, 2009, YRCW announced dismal financial results for the first quarter.  Notably, the Company reported a quarterly loss of $2.63 per share excluding significant charges, and a loss of $4.34 per share when the charges were included.  This was in comparison to a loss of $0.82 per share in the first quarter of 2008.  Additionally, the Company's April 23, 2009 press release stated the following:

> "We made significant investments in our company during the first quarter to enhance our position in the market and improve our future operating performance," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Unfortunately, the economy progressively weakened throughout the quarter making it more challenging to get ahead of the volume declines. With that said, the March 1 integration of our national networks allowed us to remove substantial capacity and reset the volume needs of our network, while significantly enhancing our service offering to the customer."

> *        *        *

> "Our volumes were impacted by multiple factors, most notably the economy and business diversion due to customer anxiety surrounding the integration of Yellow and Roadway," said Zollars. "Some customers have already returned business, which was temporarily diverted, but it is

difficult to predict at what levels or how quickly the rest will come back."

95.     That same day, *Bloomberg* published an article detailing an interview with Defendant Zollars.   According to the article, Defendant Zollars stated that he was "assuming things are going to stay much as they are this year with the economy and freight demand" and that the "continuing deterioration of the economy" was largely to blame.   The article also reported that YRC was prepared to, if necessary, close facilities in cities where it had duplicates and that the Company hoped to benefit from the $787 billion U.S. economic stimulus package.   Defendant Zollars stated that for the economy to improve, "we're going to have to see confidence improve."

96.     On this day, YRCW stock closed at $3.55 per share.

97.     Over the next two months, circumstances did not improve for YRCW, and it was becoming increasingly clear that there was no light at the end of the tunnel.   The Company's financial situation grew so grave that YRCW was facing tremendous difficulty in making pension contribution payment.   On June 18, 2009, YRCW disclosed that it had finalized an agreement whereby it would provide Company real estate as collateral in lieu of making pension contribution payments during the quarter.   The Press release stated:

> YRC Worldwide Inc. (Nasdaq: YRCW) announced today that it has finalized an agreement with Central States, Southeast and Southwest Areas Pension Fund ("Central States") in which the company will provide certain of the company's real estate as collateral in lieu of making pension contribution payments during the second quarter. The estimated combined contribution payment deferral to Central States is approximately $83 million. The agreement calls for the company to repay the deferred contributions over three years beginning in January 2010.

Central States is the largest of the company's International Brotherhood of Teamsters ("IBT") multi-employer defined benefit pension funds, representing 58 percent of the company's monthly pension funding obligations. YRC Worldwide is also finalizing discussions with its other IBT multi-employer pension funds to join as participants in this same agreement. Currently, the company has deferred about $50 million related to these other funds.

In addition, YRC Worldwide announced that it finalized an amendment to its credit agreement with its lenders that permits the company and its subsidiaries to grant second priority liens on certain owned real estate in conjunction with the pension deferrals described above. The amendment also releases escrow funds of $73 million, generated from the company's prior real estate transactions, to pay down the revolving credit facility without reducing the company's borrowing availability under the facility.

The company noted that it continues to close on its sale and financing leaseback agreements, with $94 million closed quarter-to-date through June 16. The company expects to close approximately $77 million of additional sale and financing leaseback transactions that are currently under contract.

"These transactions are especially critical as we continue to face substantial headwinds from the global economic recession," said Bill Zollars, Chairman, President and CEO of YRC Worldwide. "Today's announcement marks important milestones, which are part of our overall strategy to provide us with greater financial flexibility during the economic recession, giving us additional liquidity and the ability to use our cash to support the business."

Zollars continued, "Most importantly, we continue to improve the level of service to our customers, while we focus on making our cost structure more competitive with others in our industry, strengthening our balance sheet and reducing our short-term cash obligations."

At May 31, 2009, the company's cash and cash equivalents, excluding restricted cash of $61 million, was $155 million compared to $151 million at April 30, 2009. The aggregated cash balance and available unused capacity under the credit agreements was $242 million at May 31, 2009, compared to $221 million at April 30, 2009.

98.    On this day, YRCW stock closed at $2.05 per share.

99.    Throughout July 2009, YRCW attempted to assure the public that it was taking steps to improve its business operations and "control" the Company's response to the economic environment.  However, on July 15, 2009, RW Baird stated that YRC would likely declare bankruptcy within the year, in part because of unaddressed issues such as volume contractions, aggressive pricing, and accelerating core operating losses.

100.    On this day, YRCW stock closed at $1.55 per share.

101.     Moreover, the Company's second quarter financial results, announced on July 30, 2009, made it clear that things were only getting worse.  Notably, the Company reported a quarterly loss of $3.53 per share excluding significant charges, and a loss of $5.20 per share when the charges were included.  This was in comparison to earnings of $0.23 per share ($0.62 per share when including the curtailment gain related to the harmonization of retirement plans for non-contractual employees) in the same quarter of 2008.  The July 30, 2009 press release also included the following:

> "The second quarter was focused on executing our comprehensive plan to realize efficiencies from the YRC integration, restore financial strength and position our operating companies for future success," stated Bill Zollars, Chairman, President and CEO of YRC Worldwide. "As a result of the March integration of Yellow and Roadway, the further rightsizing of our networks in relation to volumes and the overall economic environment, we recorded some significant charges that we believe are not reflective of the underlying operating results of our company.  Although we will continue to enhance the efficiencies of our networks, we do not expect to record charges of this magnitude going forward."

> *        *        *

> "We continue to win new business, and customers have returned shipments to our networks, though it has not happened as quickly or at the levels we were initially

expecting," said Zollars. "Although misinformation about our financial stability creates noise in the marketplace, many of our key customers stand firmly behind our plans and show their support with their business every day.  We believe that as we continue to make significant progress on our plans, the tremendous support of our employees, lenders and other stakeholders can provide all of our customers with the confidence they need to completely return.

102.    On this day, YRCW stock closed at $1.69 per share.

103.    On August 12, 2009, it was reported that Stifel Nicolaus downgraded YRCW to Sell from Hold, noting that Stifel believed an eventual bankruptcy was "increasingly likely."

104.    On this day, YRCW stock closed at $2.05 per share.

105.    The Company remained relatively tightlipped over the next two months. Then, on October 30, 2009, YRCW announced a loss of $2.67 per share for the third quarter of 2009.  It was announced that third quarter shipment trends "dramatically stabilized" as compared to the first half of the year, and Defendant Zollars stated that YRCW "gained significant momentum in the third quarter as we executed our comprehensive plan to improve operation efficiencies, restore financial strength and position our company for future success."  That same day, it was reported by *Reuters* that YRCW would cut approximately nine-hundred nonunion jobs, which was projected to save the Company between $15 million and $20 million.  The *Reuters* article highlighted the fact that this round of layoffs came on top "of a series of 'workforce adjustments'" over the past year, which included more than 3,700 job reductions.

106.    On this day, YRCW stock closed at $3.65 per share.

107.    On November 2, 2009, the full truth about the Company's business operations finally began to be revealed.  On this day, the Company disclosed its intent to

commence an exchange offer whereby the Company's creditors would take 95% of the Company's stock.   More specifically, the Company's creditors would exchange approximately $536.8 million in Notes for shares of common stock and new Class A Convertible Preferred Stock (together representing 95% of YRCW's common stock). The Company's press release stated, in relevant part:

> YRC Worldwide Inc. (Nasdaq: YRCW) today announced that it intends to launch an exchange offer this week based upon terms discussed with representatives of a committee of the holders of its contingent convertible notes and a committee of the holders of its USF 8 1/2% notes (collectively the "Notes"). The successful completion of this exchange would allow the company open access to the existing $106 million revolver reserve and to begin deferring payment of lender interest and fees of approximately $25 million per quarter under its recently amended credit agreement and asset-backed securitization facility. The company currently has access to $50 million of the revolver reserve for certain operational purposes and the remaining reserve with a two-thirds approval from its lenders.
>
> 'We are pleased with the progress we've made with this group of key stakeholders in such a short amount of time. This group understands our comprehensive plan and the long-term value of this company,' stated Bill Zollars, Chairman and CEO of YRC Worldwide. 'The completion of the note exchange is an important milestone in our plan, which is expected to improve our cash flow and capital structure,' Zollars continued.
>
> In the aggregate and with full participation, noteholders would exchange approximately $536.8 million in face value of Notes plus accrued and unpaid interest for shares of common stock and new Class A Convertible Preferred Stock, which together on an as-if converted basis would represent 95% of the company's common stock, with a provision for options to be granted to the company's union employees pursuant to the company's recently ratified Amended and Restated Memorandum of Understanding on the Job Security Plan.

That same day, in an article about the exchange offer, the *Kansas City Business Journal* quoted a Longbow Research analyst as stating at the offering is "much more dilutive than we originally thought" and that "our conclusion is that management needed to entice its bondholders at the expense of its current shareholders to get the exchange offering done."

108.    On this day, YRCW stock closed at $1.32 per share.

109.    The following day, on November 3, 2009, the *Kansas City Business Journal* reported that YRCW's junk credit rating had been cut by Standard & Poor's to CC from CCC.

110.    On this day, YRCW stock closed at $1.23 per share.

111.    The next day, on November 4, 2009, *Seeking Alpha* published an article entitled "S&P: Distressed Debt Exchanges May Not Boost Credit Profile."  The article stated, in relevant part:

> Convincing debt holders to swap holdings that are in danger of default for bonds of lesser value has become an increasingly attractive option for some hard-pressed companies.  "As long as capital markets remain open, we believe that some issuers will consider this option," according to Diane Vazza, managing director of Standard & Poor's Global Fixed Income Research Group.
>
> "Yet, it's important to understand that, after a distressed debt exchange, many companies won't necessarily present a stronger credit profile," she wrote in a Q&A on the speculative grade sector.
>
> A distressed debt exchange might help some issuers ward off bankruptcy, but it could still leave them exposed to significant risk if the increasing liquidity within the system that has supported them so far were to dry up.
>
> "In fact, we've seen that in 72 recent distressed debt exchanges of U.S. companies, nearly half carry 'CCC' ratings—an indication of liquidity risk—and 30% are among our weakest links. Fourteen of these companies are no longer rated at all."

"The default rate, currently at 10.8%, will continue to inch up in the fourth quarter before we see a decline in 2010. In our last update, which we put out at the end of June, our baseline forward 12-month speculative-grade default rate was 13.9%. We now expect that by the end of the third quarter of 2010, the baseline default rate will be 6.9%."

Putting its money where its mouth is, S&P on November 2 downgraded YRC Worldwide Inc. (YRCW) to CCC from CC after the trucking company proposed a debt-for-equity swap whereby YRC may have to issue up to 1.6 billion new shares, or nearly 27 times the approximate 60 million currently outstanding.  Audit Integrity's AGR Bankruptcy Risk Model rates YRC in the lowest 1st percentile. Starting September 2009, the AGR Bankruptcy Risk Model had assigned a 15.3% bankruptcy probability (1st percentile) to YRC, though in October 2009 the AGR Bankruptcy Risk Model increased YRC's bankruptcy probability to 15.7% (1st percentile).  However, this was down from a peak of 21.3% on June 30 . . .



The Journal of Commerce reported that, "the deal is critical to YRC's near term survival, and that it would relieve — but not eliminate — the threat of bankruptcy. YRC Worldwide reported a $158 million loss in the third quarter, bringing its total losses this year to $741 million. However, more than one analyst compared the debt stock swap to a virtual Chapter 11 reorganization. "We view today's announcement as an out of court restructuring and a positive for YRC Worldwide's long term viability, at the expense of current shareholders," said Lee Klaskow, vice president and senior transportation and logistics analyst at Longbow Research.

112.   On this day, YRCW stock closed at $1.24 per share.

113.    Less than a week later, on November 9, 2009, YRCW announced in a press release that it had commenced the debt-for-equity exchange offer.   The press release stated, in relevant part:

> YRC Worldwide Inc. (Nasdaq: YRCW) announced that it is commencing an exchange offer today for all of the following outstanding series of notes:
>
> - the company's 5.0% Net Share Settled Contingent Convertible Senior Notes and 5.0% Contingent Convertible Senior Notes due 2023,
> - the company's 3.375% Net Share Settled Contingent Convertible Senior Notes and 3.375% Contingent Convertible Senior Notes due 2023, and
> - the 8 1/2% Guaranteed Notes due April 15, 2010 of the company's wholly owned subsidiary, YRC Regional Transportation, Inc.
>
> with an aggregate face value of approximately $536.8 million, plus accrued and unpaid interest. The debt instruments will be exchanged for shares of the company's common stock and new Class A Convertible Preferred Stock in such amounts as are set forth in the company's Registration Statement on Form S-4 filed today with the Securities and Exchange Commission (the "SEC"), which together on an as-if converted basis would represent approximately 95% of the company's issued and outstanding common stock. This exchange is intended to improve the company's capital structure, decrease its cash interest expense, and enhance its nearterm liquidity.
>
> The company said that the exchange offer, which was commenced following several months of ongoing, active dialogue with representatives of the noteholders, will, if successful, place the company on a more solid financial base and, in concert with other steps taken over the recent past to improve its operations and cost structure, will make it more competitive and position it to take advantage of any upturn in the economy.
>
> To validly tender their notes, the participating noteholders will be required to become party to a mutual release with

> the company and consent to an amendment of the terms of
> the notes that would remove substantially all of the material
> covenants other than the obligation to pay principal and
> interest on the notes and those relating to the conversions
> rights of convertible notes, and eliminate or modify the
> related events of default.

The *Kansas City Business Journal* reported on this announcement, highlighting the fact that if this or any other part of YRCW's "turnaround plan" was unsuccessful, the Company could likely end up in bankruptcy proceedings.

114.    On this day, YRCW stock closed at $1.18 per share.

115.    As described further herein, Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's investment alternatives—including YRCW common stock—were prudent investments for the Plan's assets.   However, Defendants failed to do so—to the substantial detriment of the Plan and its participants.

116.    Since the beginning of the Class Period through the present, the Plan's imprudent investments in YRCW common stock have been decimated, as indicated below:



*Source:* http:www.bigcharts.com.

> **(c)** **Defendants Knew or Should Have Known That YRCW Stock Was an Imprudent Investment for the Plan, Yet Failed to Plan Participants**

117.    During the Class Period, although they knew or should have known that the Company's stock was an imprudent Plan investment, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in YRCW stock.

118.    As a result of the enormous erosion of the value of Company stock, the Plan's participants, the retirement savings of whom was heavily invested in YRCW stock, suffered unnecessary and unacceptable losses.

119.    Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

120.    Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company stock

price would suffer and devastate participants' retirement savings once the truth became known. Yet Defendants failed to protect the Plan and their participants from foreseeable losses.

121.    As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in YRCW stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company stock. Thus, Plan participants were precluded from properly assessing the prudence of investing in Company stock

122.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation into whether YRCW stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding YRCW's problems so that participants—to the extent that they were permitted—could make informed decisions regarding whether to include YRCW stock in their Plan accounts.

123.    An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in YRCW stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

124.   Because Defendants knew or should have known that YRCW was not a prudent investment option for the Plan, they had an obligation to protect the Plan and the participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in YRCW stock.

125.   Defendants had available to them several different options for satisfying this duty, including, among other things: making appropriate public disclosures as necessary; divesting the Plan of YRCW stock; discontinuing further contributions to and/or investment in YRCW stock under the Plan; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or resigning as fiduciaries of the Plan to the extent that as a result of their employment by YRCW they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of YRCW stock.

126.   Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plan's investment in YRCW stock.   In fact, Defendants continued to invest and to allow investment of the Plan's assets in Company stock even as YRCW's problems came to light.

### (d)   At Least Certain of the Defendants Suffered From Conflicts of Interest

127.   YRCW's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of certain officers' compensation, including Defendant Zollars, was in the form of stock awards and option awards.   In 2008, for example, Defendant Zollars received $2,340,700 in stock awards and $82,035 in option

awards. *See* YRCW Definitive Proxy Statement, filed with the SEC on April 1, 2009, at 30.

128. Because the compensation of at least some of the Defendants was significantly tied to the price of YRCW stock, such Defendants had incentive to keep the Plan's assets heavily invested in YRCW stock on a regular, ongoing basis. Elimination of Company stock as an investment option for the Plan would have reduced the overall market demand for YRCW stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of YRCW stock, resulting in reduced compensation for such Defendants.

129. Although certain Defendants may have had no choice in tying their compensation to YRCW stock (because compensation decisions were out of their hands), they nonetheless retained the choice of whether to keep the Plan participants' and beneficiaries' retirement savings tied up in YRCW stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

130. These conflicts of interest put certain Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52 (1993); *Hahnemann Univ. Hosp. v. All Shore, Inc.,* 514 F.3d 300, 309 (3d Cir. 2008); 29 U.S.C. § 1104(a)(1)(B).

## G.     CLAIMS FOR RELIEF UNDER ERISA

131. At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

132.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

133.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

134.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

135.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

- The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;
- A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and
- A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

136.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

137.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## COUNT I

### Failure To Prudently And Loyally Manage the Plan's Assets
### (Breaches of Fiduciary Duties in Violation of ERISA
### § 404 And § 405 by all Defendants)

138.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

139.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration or management of the Plan and/or authority or control with respect to disposition of the Plan's assets.

140.    Under ERISA, fiduciaries are responsible for ensuring that investment options made available to participants under a Plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the Plan are prudently invested. Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

141.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may he or she allow others, including those whom they direct or who are directed by the plan, to do so.

142.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

143.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that YRCW common stock was imprudent and not a suitable and appropriate investment for the Plan.  Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose.  Despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

144.    Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of YRCW stock when they knew or should have known that it was not a suitable and appropriate Plan investment.

145.    Defendants further breached their duties of loyalty and prudence by failing to ensure that participants liquidated their investments in YRCW stock and transferred the sale proceeds to other investment options available in the Plan.  With actual or

constructive knowledge that Plan participants did not have full and complete information about the Company's problems, and thus were unable to make fully informed decisions about whether to retain their holdings in Company stock, Defendants had the fiduciary obligation to either inform Plan participants of the need to take action to protect their financial interests or, if necessary, to liquidate any purported ESOP component of the Plan on participants' behalf to ensure that they did not suffer a financial loss.

146.   During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

147.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement savings.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plan.

148.   Pursuant to ERISA § 409 and ERISA § 502(a), 29 U.S.C. §§ 1109 and 1132(a), Defendants are liable to restore all losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA
### §§ 404 and 405 by all Defendants)

149.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

150.    At all relevant times Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

151.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on Plan fiduciaries a duty of loyalty, that is, a duty to discharge his or her duties with respect to a Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

152.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

153.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the

Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

154.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses in the hundreds of millions of dollars and Plaintiffs and the Participants indirectly lost a significant portion off their retirement investment.

155.     Pursuant to ERISA § 409 and ERISA § 502(a), 29 U.S.C. §§ 1109 and 1132(a), Defendants are liable to restore all losses to the Plan caused by their breaches of fiduciary duties.

## COUNT III

### Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by YRCW and the Director Defendants)

156.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

157.     At all relevant times, YRCW and the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

158.      At all relevant times, the scope of the fiduciary responsibility of YRCW and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Benefits Administrative Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

159.     The duty to monitor entails both giving necessary information to and reviewing the actions of the appointed fiduciaries.  In this case, that means that YRCW and the Director Defendants, the appointing fiduciaries, had the duty to:

(a)     Ensure that the appointed fiduciaries possessed the necessary credentials and experience to properly and adequately perform their important fiduciary responsibilities;

(b)     Ensure that the appointed fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the appointed fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the appointed fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the appointed fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investments; and

(f)     Ensure that the appointed fiduciaries report regularly to the appointing fiduciaries.   The appointing fiduciaries must then review, understand, and approve the conduct of the hands-on (or appointed) fiduciaries.

160.    Under ERISA, an appointing fiduciary must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a Plan and its participants when they are not.  In addition, an appointing fiduciary must provide the appointed fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the appointed fiduciaries must have in order to prudently manage a Plan and a Plan's assets.

161.    YRCW and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, (b) failing to ensure that the appointed fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation, (c) failing to monitor the performance of the appointed fiduciaries, and (d) failing to replace the appointed fiduciaries once it became clear that the appointed fiduciaries were not taking all necessary steps to protect the interests of the Plan participants.

162.    YRCW and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plan in YRCW common stock when it no longer was prudent to do so; and (ii) imprudently allowing the Plan to continue offering YRCW stock as an investment alternative.  Despite this knowledge, YRCW and the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

163.    In addition, YRCW and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the appointed fiduciaries accurate information about the financial condition of YRCW that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

164.    YRCW and the Director Defendants are also liable as co-fiduciaries under ERISA § 405(a) because they knowingly participated in the appointed fiduciaries' breaches by enabling those breaches through their failure to monitor.  YRCW and the Director Defendants are also liable as co-fiduciaries for failing to make any effort to remedy the appointed fiduciaries' breaches of duty, despite having knowledge of them.

165.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

166.    Pursuant to ERISA § 409 and ERISA § 502(a), 29 U.S.C. §§ 1109 and 1132(a), Defendants are liable to restore all losses to the Plan caused by their breaches of fiduciary duties.

## H.    CAUSATION

167.    The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

168.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and its participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company stock.

## I.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

169.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

170.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409

requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

171.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.   In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

172.   Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

173.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling the Defendants to make good to the Plan all losses to resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.    An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of YRCW maintained by the Plan in proportion to the accounts' losses attributable to the decline in YRCW's stock price;

F.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G       An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

## JURY DEMAND

Plaintiff demands trial by jury in Kansas City, Kansas.

DATED:  December 7, 2009                    Respectfully submitted,

**THE NYGAARD LAW FIRM**

By:   s/ Diane A. Nygaard
Diane A. Nygaard
11050 Roe Avenue, Suite 212
Leawood, KS  66211
Telephone: (913) 469-5544
Toll Free: (888) 469-5544
Facsimile: (913) 469-1561
*diane@nygaardlaw.com*

**BARROWAY TOPAZ KESSLER
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff and the Proposed
Class*